## APPEAL OF TRIMOUNT THEATRES, INC.

Docket No. 4132.   Submitted March 6, 1926.   Decided June 23, 1926.

A certain leasehold *held* to have had no value, at the time acquired, for invested capital purposes.

*Harry F. R. Dolan, Esq.*, for the petitioner.
*W. Frank Gibbs, Esq.*, for the Commissioner.

Before GRAUPNER [1] and TRAMMELL.

This is an appeal from the determination of a deficiency for 1919 in the amount of $1,077.62. The taxpayer assigns error on the part of the Commissioner in refusing to allow, for invested capital purposes, any value for a certain leasehold which the taxpayer claims had a value of $100,000.

### FINDINGS OF FACT.

The taxpayer is a Massachusetts corporation, organized June 14, 1918. During the taxable year it was engaged in the business of operating the St. James Theatre of Boston. On June 15, 1918, it acquired a lease from one Moses H. Gulesian on the St. James Theatre Building for a term of five years, commencing September 1, 1918, with the privilege of a renewal for an additional five years. The lease provided for an annual rental of $37,500 payable in 40 equal installments of $937.50 for the first five years and an annual rental of $42,500 for the second five-year period. The circumstances leading up to the lease were as follows:

---

[1] This decision was prepared during Mr. Graupner's term of office.

In 1913 the said theatre was leased to the Loew interests for a five-year period at an annual rental of $32,000, with the privilege of renewal for another five-year period at $37,500 per year. The first five-year period expired September 1, 1918. In the early part of 1918 the Loew interests were dissatisfied with certain of the provisions of the lease and there was some doubt whether they would exercise the right of renewal at $37,500. The provisions objected to related to the reservation of a part of the building to Gulesian, the lessor, for office purposes, a theatre box for the lessor and family, and the extension of certain other privileges which led to personal disputes between the lessor and employees of the lessee. Feeling that the Loew interests might not accept a renewal of the lease, Gulesian obtained the services of a broker who specialized in negotiating theatre leases to obtain a tenant for him. This broker interested one George A. Giles in the lease. Giles was a real estate man who specialized in the building and managing of theatres and in buying and selling leases of theatres. Upon the refusal of the Loew interests to accept a renewal of the lease at $37,500 with the objectionable provisions above referred to, Gulesian agreed to lease the premises to Giles for five years at $37,500 and a five-year extension for $42,500, the lease, however, to retain certain provisions objected to by the Loew interests. Giles, not desiring personally to undertake the lease, formed the taxpayer corporation, with himself, his wife and two brothers as stockholders. Gulesian for some time refused to make the lease to the taxpayer, and it was only after considerable negotiations and the agreement of the taxpayer to pay $5,000 advance rent and to deposit certain securities, that he consented to do so. After the lease was made, 198 shares of the par value of $100 each were issued to Giles, 116 shares to his wife, 400 shares to each of his brothers, and a few qualifying shares to others. His wife and brothers were instrumental in securing the cash and securities required to obtain the lease, viz, $5,000 advance rent and $15,000 in securities to be deposited as security, and $8,500 required to purchase the personal property left in the premises by the former lessee.

The taxpayer commenced to operate the theatre as a moving picture and vaudeville house on September 1, 1918. Being a newcomer in this field, it experienced difficulty in getting suitable vaudeville acts and was put to much additional expense in getting the business started on a profitable basis. From September 1, 1918, to December 31, 1918, it suffered a loss of $41.55. In 1919, however, the taxpayer came to be recognized by the booking houses and was able to get suitable vaudeville and other attractions. In that year it made a net profit of $11,613.61, and in 1920 made a net operating profit of $53,735.23.

On December 28, 1920, the taxpayer sold its lease to George A. Giles Co., a corporation, receiving $40,000 par value of its capital stock. On June 1, 1921, the taxpayer purchased the interest of the said Gulesian in the property, including store rooms on the first floor, for $150,000, and thereafter continued only as a holding company. The George A. Giles Co., after September 21, 1921, commenced to operate a theatre with a stock company and abandoned the moving-picture and vaudeville business for the reason that the Loew interests had erected a new and larger theatre in the same block. The George A. Giles Co. during 1921 made a profit of about $40,000; in 1922, $29,000; and in 1923, $27,000; and for the remainder of the term about $25,000 to $30,000 per year.

In August, 1925, the taxpayer leased the theatre to the Keith interests for seventeen years, at an annual rental of $50,000 for the first eight years and $52,000 for the balance of the term. The new lessee was also required to pay for other items, amounting to $2,000 or $3,000 per year, that the taxpayer did not have to pay under the original lease of Gulesian to the taxpayer.

The St. James Theatre was located near the junction of Massachusetts Avenue and Huntington Avenue, the two principal thoroughfares of Boston, in a rapidly growing section of the city. It was in the center of a densely populated district. In the vicinity was the Horticultural Hall, the Mechanics Building, the Boston Opera House, the Y. M. C. A., and several schools and colleges. Numerous lodging houses, a large student population and people of moderate means were located in this district.

### OPINION.

TRAMMELL: The taxpayer contends that the leasehold in question was paid in for stock and was worth $100,000, and that that sum should be included in invested capital. The Commissioner contends that (1) the leasehold was not in fact paid in for stock of the taxpayer; (2) if it was paid in for stock the value, for invested capital purposes, could not exceed the cost to the previous owner under the provisions of section 331 of the Revenue Act of 1918; and (3) it had no value in excess of the stipulated rentals at the time acquired.

We will discuss the last contention first. The taxpayer, in support of its valuation, presented the evidence of several witnesses whose training and experience in dealing in such properties qualified them to express their opinions with respect to values. They expressed opinions that the value of the leasehold at the time of acquisition was from $100,000 to $125,000. We believe, however, that these witnesses did not take into consideration all of the actual conditions and circumstances existing which would reflect the actual cash

value of the lease, but if they did, we must bear in mind that it is only the actual cash value of the leasehold at the time it was alleged to have been paid in for stock that is material. In other words, the amount that a willing purchaser would give and a willing seller would take. In this appeal we find an experienced buyer and seller dealing at arm's length, negotiating back and forth, who finally, after considerable negotiations, agreed upon the terms and conditions that another theatrical organization (former lessee), although well able financially to pay the rental and although it desired to have a theatre in that locality, refused to accept. From the evidence it appears that Mr. Gulesian built the theatre in 1911 on property held by him under a long-term lease. In 1913 he leased it to the Loew interests for $32,000 for five years, with a renewal privilege for five years more at $37,500. He retained his private office in the theatre; he had a box reserved for his exclusive use and required weekly payments of the rent. He was in daily contact with the business and must have known what business the theatre was doing or was capable of doing. In fact his close personal contact was such that it was objectionable to the Loew interests. It being doubtful whether the Loew interests would renew at $37,500 under the terms of the lease, we find Gulesian, early in 1918, searching for another tenant. He employed an experienced theatrical broker to obtain a tenant. This broker put him in touch with Giles, who was also an experienced theatrical man. Their negotiations resulted in a lease at $37,500, containing practically as stringent terms as those objected to by the Loew interests. Gulesian required the taxpayer to pay $5,000 advance rent and to deposit $15,000 collateral as security for future rentals. The Loew interests must have been familiar with the future possibilities of this location for a theatre, as they had been operating there for five years. They refused to renew at $37,500. A representative of the Loew interests testified that he was surprised that Gulesian could get another tenant at the same terms. So we have a situation where former lessees refused a renewal on substantially the same terms accepted by the taxpayer; where the lessor being fully advised of the conditions voluntarily made the lease; where an experienced theatrical broker, acting for the lessor, sought the best terms for his client; and where the taxpayer, under the management of an experienced theatrical man, accepted the lease and on the terms mentioned. All parties were dealing at arm's length. How, under such conditions, can we hold that the actual cash or market value at that time was in excess of the amount arrived at by the parties? This evidence of the actual transactions at the time, under the circumstances, to our mind, has greater weight than the opinions of witnesses as to value. At the time the lease was

executed we are not convinced that it had an actual cash value in excess of the annual rentals. See *Appeal of Saenger Amusement Co.*, 1 B. T. A. 96.

If it be conceded, however, that the lease had in fact the value claimed by the taxpayer, it is not shown to have been acquired for stock. The stock was issued to Giles, his wife and two brothers. These individuals did not have the lease, nor did Giles have it. The corporation was the lessee from Gulesian and it issued no stock to him. The most that can be said is that Giles had a verbal agreement for the lease and he desired to have the lease made to the corporation instead of to himself. It was only after considerable negotiations and additional consideration, in the way of advance rent and collateral, that the landlord finally consented to make the lease to the corporation. There is no evidence that any option to lease was assigned to the corporation, and if it was it is not shown to have had any value as the landlord did not feel himself bound and did not make the lease to the corporation based on any option, but made an entirely new arrangement on different terms.

On either of the above propositions, the determination of the Commissioner must be approved, and it is not necessary to discuss the contention of the Commissioner as to the applicability of section 331 of the Revenue Act of 1918.

> *The deficiency is $1,077.62. Order will be entered accordingly.*